18 P.3d 938

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Keoki A. ASTRONOMO, Defendant–Appellant.**

**No. 22221.**

Intermediate Court of Appeals of Hawai'i.

Jan. 24, 2001.

As Amended Feb. 15, 2001.

Earle A. Partington, on the briefs, Honolulu, for Defendant–Appellant.

Simone C. Polak, Deputy Prosecuting Attorney, County of Maui, on the briefs, for Plaintiff–Appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by BURNS, C.J.

On July 16, 1997, after a traffic stop, police officer Clyde Holokai arrested Defendant–Appellant Keoki A. Astronomo (Astronomo). The grand jury subsequently charged Astronomo with the following counts: Count One, Place to Keep Firearm, Hawai'i Revised Statutes (HRS) § 134–6(d); Count Two, Felon in Possession of a Firearm, HRS § 134–7(b) [1]; Count Three, Felon in Possession of Firearm Ammunition, HRS § 134–7(b); Count Four, Promoting a Dangerous Drug in the Third Degree, HRS § 712–1243(1); and Count Five, Prohibited Acts Related to Drug Paraphernalia, HRS § 329–43.5(a).

Astronomo appeals the circuit court's (a) January 27, 1999 Findings of Fact and Conclusions of Law; Order (January 27, 1999 FsOF, CsOL, Order) denying his June 25, 1998 pre-trial Motion to Suppress Evidence (June 25, 1998 M/S) (which motion he renewed during trial on October 12, 1998, and post-trial on October 26, 1998) and (b) De-

---

1. Hawai'i Revised Statutes (HRS) § 134–7(b) (1993) states as follows:

No person who is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or an illegal sale of any drug shall own, possess, or control any firearm or ammunition therefor.

cember 18, 1998 Judgment, upon a jury's verdict, convicting him of Counts Two and Three and sentencing him to concurrent ten-year terms of imprisonment, forfeiture of the firearms and ammunition, and payment of a $400 criminal injuries compensation fee. We affirm the January 27, 1999 FsOF, CsOL, Order. We vacate the December 18, 1998 Judgment and remand for a new trial consistent with this opinion.

## BACKGROUND

The January 27, 1999 FsOF nos. 9 through 15, 31, and 32 are the most relevant to one of Astronomo's points on appeal. With those findings of fact presented in bold type, the January 27, 1999 FsOF, CsOL, Order state, in relevant part, as follows:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant, KEOKI A. ASTRONOMO filed his Motion to Suppress Evidence on June 24 [sic], 1998.... Based upon the evidence adduced at the hearings on this motion, the Court hereby makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. On Wednesday, July 16, 1997, at approximately 1:30 A.M., while traveling south on Honoapiilani Highway just passing Aholo Road (that is, traveling in the Maalaea direction), Officer Clyde Holokai observed the Defendant's vehicle traveling at a high rate of speed in the opposite direction on Honoapiilani Highway (that is, traveling in the Kaanapali direction).

2. Officer Holokai turned around and began to pursue said vehicle, a 1996 Nissan four-door sedan, white in color, bearing State of Hawaii license plate number MCE–055, and later determined to be registered to Alamo Rent A Car.

3. Officer Holokai caught up with said vehicle as it approached Prison Street.

4. Said vehicle started to drift over to the mauka[2] shoulder and with its right hand turn blinker on.

5. Officer Holokai activated his blue lights, now concerned that the driver may have been under the influence of alcohol or drugs.

6. Said vehicle did not stop, but instead continued at a slow pace in the mauka bike lane of Honoapiilani Highway, traveling from Prison to Dickenson Street and turning right at the intersection with the Texaco Mart, then traveling up Dickenson Street to Mill Street, where said vehicle finally stopped.

7. As Officer Holokai parked his vehicle to the rear of said vehicle, he observed both the driver and passenger to slouch so far down into their seats that he could not see them.

8. Officer Holokai walked up to the driver, the Defendant Keoki A. Astronomo [(Astronomo)], while Officer Michael Taketa arrived and walked up to the passenger, Alexander Wilsey.

9. Officer Holokai identified himself to [Astronomo] and, while checking for [Astronomo's] driver's license, vehicle registration, and outstanding bench warrants, shined his flashlight into the vehicle for officer safety.

10. Officer Holokai then observed a small clear plastic baggie on the passenger side dash board, containing what appeared to be a white powdery substance.

11. Officer Holokai shined his flashlight on the floorboard and observed various tools lying around the feet of Alexander Wilsey.

12. Officer Holokai noted that [Astronomo] was making some sort of shuffling movement with his feet.

13. Officer Holokai shined his flashlight on the front floorboard and at [Astronomo's] feet observed a small black fabric bag with the butt of a handgun protruding from a large compartment of said bag and two magazine cartridges protruding from

2. "Mauka" is defined as "[i]nland, upland, towards the mountain[.]" Pukui & Elbert, Hawaiian Dictionary, at 242, 365.

two smaller compartments on the side of said bag.

14. Officer Holokai then yelled to Officer Taketa of the presence of a gun, drew his service pistol, and ordered [Astronomo] to keep his hands visible at all times.

15. Officer Holokai then ordered [Astronomo to] put his hands outside his window, open his door with his right hand, step slowly out of the vehicle and walk backwards, then lie on the ground with both hands interlocked behind his head.

16. Officer Holokai then handcuffed [Astronomo] and walked [Astronomo] over [to] Officer Holokai's patrol vehicle, where he pat down [Astronomo] and put him in said patrol vehicle.

17. Alexander Wilsey was likewise handcuffed and placed within the patrol vehicle of Officer Jay Serle, who had just arrived on the scene.

18. Officer Holokai then advised [Astronomo] and Wilsey of their constitutional rights.

19. Officer Michael Taketa later drove said Nissan to the Lahaina Police Station and recovered various items from within.

20. A black bag was recovered from the driver's floorboard of said Nissan sedan and found to contain an Essex Arms .45 caliber semi-automatic pistol, holding a magazine loaded with eight live .45 caliber semi-jacketed hollow point bullets.

21. A second magazine with eight live .45 caliber semi-jacketed hollow point bullets, and a third magazine with five live .45 caliber full-metal jacketed bullets and two live .45 caliber semi-jacketed hollow-point bullets were also found.

22. Also recovered from said bag were $1,380.00 in U.S. currency in the form of sixty-nine (69) twenty dollar bills, seven more live .45 caliber semi-jacketed hollow-point bullets, a black handgun case, and a Tanita Model 1479 digital gram scale.

23. Also recovered from the dashboard was .077 grams of crystal methamphetamine.

24. At 11:33 that morning, [Astronomo] signed a consent to search form and gave consent to Detectives Karl Freitas and Jayson Rego to search said Nissan.

25. After being advised of his Miranda rights by Officer Holokai, [Astronomo] denied knowledge of any firearm. When informed by Office Holokai that he had just seen the ammunition, [Astronomo] replied "Well, you know where the gun is then."

26. After being advised of his Miranda rights by Officer Garret Tihada, [Astronomo] said that he had obtained the car at about 6:00 pm and went to get gas. At the gas station, [Astronomo] observed a black bag on the floor near his feet. He opened the black bag and saw a smaller bag within. He opened the smaller bag and found a lot of money within, but did not count the money. He felt a gun within the same area of the bag where the money was located but he did not take the gun out.

27. After being advised of his Miranda rights by Detective Karl Freitas, [Astronomo] said that he had gone to a gas station to fill the tank up when he noticed a black bag on the floor. He unzipped the bag partially and observed a wallet containing some money and looked into another bag and found some bullets. He did not look any further. He then zipped the bag up and placed it back on the floor.

28. The CAD Incident History log is not a word-for-word record of all events occurring at a crime scene such as a traffic stop. Police Dispatchers do not necessarily record everything and are not able to record everything during the course of their duties.

29. [Astronomo] acknowledged on the witness stand under oath that prior to said stop by Officer Holokai that he was in fact driving over the speed limit in said Nissan on Honoapiilani Highway.

30. Officer safety is a legitimate concern, especially in the course of a traffic stop at 1:30 in the morning.

31. The credibility of Olena Sarasin, Vailani Casil, Alexander Wilsey, and [Astronomo], cannot be accepted with respect to an illegal search of said Nissan and an alleged beating of [Astronomo] by Officer Clyde Holokai. Their testimony and infer-

ences therefrom are inconsistent with the facts and defy common sense and reason.

32. The testimonies of Officers Holokai, Taketa, Merle Matsukado, Garret Tihada, Jay Serle, and William Devlin, and Public Safety Aid Florendo Tabios are much more credible, consistent with the facts, and comport with common sense and reason.

## CONCLUSIONS OF LAW

1. A law enforcement officer may "in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest.["] *State v. Ward*, 62 Haw. 459[, 617 P.2d 565] (1980) citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 29 [20] L.Ed.2d 889 (1968).

2. This action is "warranted by the general governmental interest in effective crime prevention and detection; and that, given a state of facts, which separately may appear innocent but which taken together would warrant investigation, it would be poor police work to fail to make further investigation." *State v. Goudy*, 52 Haw. 479 [497], 501[, 479 P.2d 800] (1971) citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

3. "[D]ue regard for the practical necessities of effective law enforcement requires that the validity of brief, informal detention be recognized whenever it appears from the totality of the circumstances that the detaining officers could have had reasonable grounds for the action. A founded suspicion is all that is necessary, some basis from which the court can determine that the detention was not arbitrary or harassing." *State v. Goudy*, 52 Haw. 497, 502[, 479 P.2d 800], (1971) citing *Wilson v. Porter*, 361 F.2d 412, 415 (9th Cir.1966).

4. Where an officer is in possession of information, where he can point to specific and articulable facts which would warrant a man of reasonable caution to believe that criminal activity involving the suspect is afoot, the officer is authorized to make a temporary investigative stop. *State v.*

*Madamba*, 62 Haw. 453, 617 P.2d 76 (1980).

5. It was in the general interest of effective crime prevention and law enforcement that Officer Holokai made the investigative stop. *State v. McCully*, 64 Haw. 407, 642 P.2d 933 (1982) *cert. den.; Gana v. Hawaii*, 459 U.S. 830, 103 S.Ct. 68, 74 L.Ed.2d 68 [ (1982) ].

6. Officer Holokai observed [Astronomo] to be speeding on Honoapiilani Highway at approximately 1:30 in the morning. When he pursued and caught up to [Astronomo's] vehicle, [Astronomo] began to drift to the right with his blinker on, causing Officer Holokai to suspect that [Astronomo] was driving under the influence of alcohol or drugs. After Officer Holokai activated his blue lights, [Astronomo] refused to stop and continued to drive down Honoapiilani Highway in the bike lane to Dickenson Street, turned right on Dickenson Street, drove to Mill Street, and then stopped.

7. [Astronomo] admitted under oath that he was speeding in said Nissan on Honoapiilani Highway. Under these circumstances, it would have been negligent for Officer Holokai not to make a stop of said Nissan.

8. Although search and seizure principles apply to vehicles, [d]efendants have a lesser expectation of privacy in objects in their car because it has been held that a person's expectation of privacy is diminished with regard to automobiles for purposes of the state and federal constitutional prohibitions against unreasonable searches and seizures. *State v. Wong*, 68 Haw. 221, 223, 708 P.2d 825 (1985); *State v. Jenkins*, 62 Haw. 660, 663, 619 P.2d 108, 111 (1980).

9. The gun and ammunition magazines were evidence validly viewed and seized under the open-view doctrine. Their location on the front floorboard of said Nissan was in open view, knowingly exposed to any member of the public who might look into the vehicle.

10. What a person knowingly exposes to the public, even in his own home or office, is not a subject of constitutional

protection. *State v. Wyatt,* 67 Haw. 293, 306[, 687 P.2d 544], (1984).

11. Where the objects observed by the police are in "open view", it is not subject to any reasonable expectation of privacy and the observation is not within the scope of the constitution. *State v. Wyatt,* 67 Haw. 293, 306[, 687 P.2d 544], (1984), citing *Lewis v. United States,* 385 U.S. 206, 210[, 87 S.Ct. 424, 17 L.Ed.2d 312] [ (1966) ]; *United States v. Lee,* 274 U.S. 559, 563[, 47 S.Ct. 746, 71 L.Ed. 1202] [ (1927) ]; *Katz v. United States,* 389 U.S. 347, 351–52[, 88 S.Ct. 507, 19 L.Ed.2d 576] (1967).

12. Officer Holokai was authorized to shine his flashlight into the passenger compartment of the Nissan sedan to check for weapons. [Astronomo] and his passenger were acting in a very suspicious manner in slouching down so as not to be observed. [Astronomo] was also moving his feet in a suspicious manner. The small black fabric bag was observed while Officer Holokai was standing outside the driver's door, speaking to [Astronomo].

13. The Fourth Amendment does not proscribe observation of objects in plain view as long as the police officer is legally in a position to make the observation. *State v. Brighter,* 63 Haw. 95, 621 P.2d 374 (1980). *See also, State v. Kuahuia,* 62 Haw. 464[, 616 P.2d 1374] (1980); *State v. Kaaheena,* 59 Haw. 23[, 575 P.2d 462] (1978).[3]

14. A police officer may properly order an occupant to step out of a vehicle, provided the officer has a reasonable basis of specific articulable facts to believe that a crime has been committed. *State v. Kim,* 68 Haw. 286, 290[, 711 P.2d 1291] (1985).

15. When considering whether or not it was proper for a police officer to order occupants to step out of a vehicle, the court must weigh the evidence constituting the whole picture, "not in terms of library analysis by scholars, but as understood by those versed in law enforcement." *State v.*

*Nakachi,* 7 Haw.App. 28, 38[, 742 P.2d 388] (1987), citing *United States v. Cortez,* 449 U.S. 411, 418[, 101 S.Ct. 690, 66 L.Ed.2d 621] (1981).

16. Looking then at the specific and articulable facts known to the officers in the present case, that [Astronomo] would not stop his vehicle for a considerable distance, that [Astronomo] and his passenger attempted to slouch down from sight of the Officers, that a packet of white powdery substance was lying on the vehicle dashboard, that various tools were at the feet of the passenger, that [Astronomo] was moving his feet in a suspicious manner, and that a bag with the butt of a handgun and two magazine clips protruding therefrom was on the floorboard at [Astronomo's] feet, it was clearly appropriate for [Astronomo] to be asked to step out of the vehicle.

17. Officer Taketa was authorized to enter said Nissan for the purposes of moving and securing the vehicle. [Astronomo] had already been arrested and taken to the police station. The Officer was left in a position to be responsible for said Nissan. The gun and ammunition magazines were observed while [ ] Officer Taketa was carrying out his duties.

. . . .

19. Moreover, the gun and ammunition magazines would have inevitably been discovered upon search of said Nissan after [Astronomo] gave consent to search the car. Keoki A. Astronomo signed the consent to search form at 11:33 A.M. The gun and ammunition magazines would have been discovered at that point anyway.

20. As long as the State presents clear and convincing evidence that the evidence would have inevitably been discovered by lawful means, said evidence may be admitted under the inevitable discovery exception. *State v. Lopez,* 78 Hawai'i 433, 451[, 896 P.2d 889] (1985) [1995].[4]

3. Conclusions of Law nos. 13 and 18 are identical.

4. In footnote 14 on page 21 of his opening brief, Defendant–Appellant Keoki A. Astronomo (Astronomo) notes that "[t]he court's conclusions of law nos. 19 & 20 ... is [sic] irrelevant to this appeal if the police unreasonably detained Astronomo before discovering these items of contraband."

21. Here, the gun and ammunition magazines were discovered while Officer Taketa was securing the vehicle. The gun and ammunition magazines were in open view. This evidence would have been recovered pursuant to the consent to search which followed soon thereafter. The evidence, therefore, was not recovered in violation of [Astronomo's] constitutional rights.

### ORDER

Based upon the foregoing Findings of Facts and Conclusions of Law, the Court hereby orders that all evidence found and seized from said Nissan sedan bearing State of Hawaii license plate number MCE–055, occupied by Defendant, KEOKI A. ASTRONOMO, shall be admitted.

(Footnotes added.)

The parties stipulated that (1) prior to July 16, 1997, Astronomo became a convicted felon, and (2) on or about July 16, 1997, Astronomo was aware that as a convicted felon he was prohibited from owning, possessing, or controlling any type of firearm or ammunition.

### DISCUSSION

### 1.

In the past, the Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) concepts of "plain error" (court erred but counsel failed counsel's duty to object) or the HRPP Rule 52(a) concepts of "harmless error" (court erred and counsel did not have a duty to object or had a duty and did not fail it) have been applied to jury instructions, depending on whether counsel objected. *State v. Valentine*, 93 Hawai'i 199, 205, 998 P.2d 479, 485 (2000); *State v. Kaiama*, 81 Hawai'i 15, 911 P.2d 735 (1996). But, as is noted in *Valentine,*

it may be plain error for a trial court to fail to give an … instruction even when neither the prosecution nor the defendant have requested it … because … 'the ultimate responsibility properly to instruct the jury lies with the circuit court and not with trial counsel.' *[State v. ]Arceo*, 84

Hawai'i [1, ] at 33, 928 P.2d [843,] at 875 [ (1996) (citations omitted) ].

*Valentine,* 93 Hawai'i at 205, 998 P.2d at 485.

■ In light of the above, with respect to jury instructions, the distinction between "harmless error" and "plain error" is a distinction without a difference. We conclude that the standard of review applicable in all cases when jury instructions or the omission thereof are challenged on appeal is as follows:

[T]he standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading.

[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Cabrera,* 90 Hawai'i 359, 364–65, 978 P.2d 797, 802–03 (1999) (citations and internal quotations omitted).

■ We will now examine the trial court's jury instructions regarding HRS § 134–7(b).

### Instruction No. 28

In Count Two of the Indictment, the Defendant KEOKI A. ASTRONOMO, is charged with the offense of Felon in Possession of a Firearm.

A person commits the offense of Felon in Possession of a Firearm if, having been previously convicted of committing a felo-

ny, he owns, possesses or controls any firearm.

There are three material elements of the offense of Felon in Possession of a Firearm, each of which the prosecution must prove beyond a reasonable doubt.

These three elements are:

1. That, on or about July 16, 1997, in the County of Maui, State of Hawaii, the Defendant KEOKI A. ASTRONOMO was previously convicted of committing a felony;

2. That the Defendant thereafter owned, possessed or controlled a firearm; and

3. That the Defendant did so intentionally, knowingly or recklessly.

Instruction No. 29

In Count Three of the Indictment, the Defendant KEOKI A. ASTRONOMO, is charged with the offense of Felon in Possession of a Firearm Ammunition.

A person commits the offense of Felon in Possession of a Firearm Ammunition if, having been previously convicted of committing a felony, he owns, possesses or controls any firearm ammunition.

There are three material elements of the offense of Felon in Possession of a Firearm Ammunition, each of which the prosecution must prove beyond a reasonable doubt.

These three elements are:

1. That, on or about July 16, 1997, in the County of Maui, State of Hawaii, the Defendant KEOKI A. ASTRONOMO was previously convicted of committing a felony;

2. That the Defendant thereafter owned, possessed or controlled a firearm ammunition; and

3. That the Defendant did so intentionally, knowingly or recklessly.

Recently, in *Valentine*, the Hawai'i Supreme Court vacated the judgment convicting Valentine of the offense of Attempted Prohibited Possession of a Firearm. *Valentine*, 93 Hawai'i at 210, 998 P.2d at 490. The jury instruction that the trial court gave in *Valentine* was

that the elements of the offense of prohibited possession of a firearm were: ... one, that prior to March 22, 1997, ... [defendant] was convicted of committing a felony, and two, that on or about March 22, 1997, [defendant] owned, possessed or controlled a firearm, and three, that [defendant] did so intentionally, knowingly, or recklessly.

*Id.* at 209, 998 P.2d at 489.

The Hawai'i Supreme Court noted the following two deficiencies in the instruction. First, it noted that this jury instruction "regarding 'possession' was silent as to the manner in which possession may be reckless." *Id.* More specifically, this instruction failed to explain the possibilities of actual or constructive possession, solely or jointly with others.

Second, it quoted the following precedent:

[F]or the purposes of HRS § 134–7(b), "possession" must be analyzed employing a two-pronged analysis: (1) the voluntary act of "possession" of an object itself is, by way of HRS § 702–202, satisfied where an individual acts knowingly with respect to his or her conduct; and (2) the requisite state of mind with respect to the attendant circumstances—i.e., the particular qualities of the object that make it illegal to possess it—is, by way of HRS § 702–204, satisfied by a reckless state of mind. Thus, as applied, to prove the "voluntary act" of possession, the prosecution must first adduce evidence that the defendant knowingly procured or received an object, or was aware of his or her control of that object for a sufficient period to have terminated possession. See HRS § 702–202. Second, to prove the requisite state of mind regarding the particular qualities of the object, the prosecution must, at the very least, adduce evidence that the defendant possessed the object in reckless disregard of the substantial and unjustifiable risk that it was a firearm. See HRS § 702–204.

*Id.* at 210, 998 P.2d at 490 (quoting *State v. Jenkins,* 93 Hawai'i 87, 111, 997 P.2d 13, 37 (2000)) (footnote omitted).

The instructions given in Astronomo's case do not satisfy the requirements of *Valentine*

and *Jenkins* noted above. In light of the facts of this case, this deficiency is not harmless beyond a reasonable doubt. Therefore, the December 18, 1998 Judgment must be vacated.

### 2.

The jury trial commenced on September 28, 1998, and concluded on October 16, 1998. On June 25, 1998, prior to the trial, Astronomo filed his June 25, 1998 M/S of the following:

1. One .45 caliber pistol.
2. Three magazines of .45 caliber bullets.
3. One black handgun case.
4. Seven .45 bullets.
5. About .4 grams of alleged methamphetamine.

During trial (on October 12, 1998), and post-trial (on October 26, 1998), Astronomo renewed his June 25, 1998 M/S. Each was denied. In this appeal, Astronomo challenges the denials.

Astronomo does not challenge any of the January 27, 1999 FsOF. Therefore, all are valid.

In his opening brief, Astronomo states, in relevant part, as follows:

### IV. QUESTIONS PRESENTED

A. WHETHER THE CIRCUIT COURT ERRED IN HOLDING THAT AN UNEXPLAINED DELAY OF APPROXIMATELY 30 MINUTES BETWEEN A TRAFFIC STOP AND AN ARREST WAS REASONABLE IN THE FACE OF CONTRADICTORY POLICE TESTIMONY CONCERNING THE EVENTS FOLLOWING THE STOP?

. . . .

### V. ARGUMENT

A. THE CIRCUIT COURT ERRED IN ITS IMPLIED FINDING THAT THERE WAS NOT AN UNREASONABLE DELAY BETWEEN THE TRAFFIC STOP OF [ASTRONOMO'S] VEHICLE AND THE FINDING OF CONTRABAND

. . . .

The trial judge did not address any of these gaps or discrepancies in information in his oral or written findings of fact. He simply stated that he found the officers' testimony more credible than that of civilian witnesses without saying which officers or which testimony he found credible.

The point here is that the evidence appears to show quite clearly that there was a substantial delay between the stop of Astronomo's car and the arrest of Astronomo, a delay for which the police witnesses offered no credible explanation. The law is clear that once the purpose of an initially valid traffic stop has been satisfied, any further detention or questioning of the driver of a vehicle constitutes an unreasonable and unlawful detention under the federal and state constitutional guarantees against search and seizure.

... The problem with the instant case is that the police testimony is not only contradictory, but fails to offer any credible explanation for what happened during the more than 30 minutes that transpired between the stop and the removal of Astronomo and his passenger from the scene by the police. The trial court's failure to address this issue is inexcusable and its findings related to this issue are clearly erroneous. Absent some credible explanation for the delay, Astronomo was entitled to have his motion to suppress granted.

(Citations omitted, emphases in original.)

As can be seen from the above, Astronomo complains of both (1) a "holding that an unexplained delay of approximately 30 minutes between a traffic stop and an arrest was reasonable[,]" and (2) the "implied finding that there was not an unreasonable delay between the traffic stop of [Astronomo's] vehicle and the finding of contraband." We conclude that only complaint (2) above is relevant to Astronomo's motions to suppress.

FsOF nos. 7, 8, 9, 10, 11, and 13 find that "Officer Holokai parked his vehicle ... walked up to ... Astronomo, ... identified himself to [Astronomo] and while checking for [Astronomo's] driver's license, vehicle registration, and outstanding bench warrants, [Officer Holokai] shined his flashlight

into the vehicle" and "then observed" the "plastic baggie," then "various tools," then "the butt of a handgun," and "two magazine cartridges." These findings of fact clearly establish that there was no unreasonable delay between the traffic stop of Astronomo's vehicle and the finding of the contraband authorizing the arrest. The lapse of time between the finding of the contraband and the arrest is not relevant to Astronomo's motions to suppress.

### 3.

 In Defendant–Appellant's Motion for Reconsideration of Published Opinion Filed December 6, 2000, filed by Astronomo on December 18, 2000 (December 18, 2000 M/R), Astronomo contends that "the issue of the delay between the stop and the arrest is only relevant as to the motion to suppress." We disagree and respond as follows: First, the issue of the delay between the stop and the arrest has no relevance to the motions to suppress. Second, based on the following two considerations, we conclude that the evidence relevant to the motions to suppress is the combination of the evidence received (a) pre-trial at the motion to suppress hearing and (b) at trial: (1) Astronomo's renewal during the trial and post-trial of his June 25, 1998 M/S, and (2) the rule of law that

> when the defendant's pretrial motion to suppress is denied and the evidence is subsequently introduced at trial, the defendant's appeal of the denial of the motion to suppress is actually an appeal of the introduction of the evidence at trial. Consequently, when deciding an appeal of the pretrial denial of the defendant's motion to suppress, the appellate court considers both the record of the hearing on the motion to suppress and the record of the trial.

**5.** HRS § 702–207 (1993) states:
 Specified state of mind applies to all elements. When the definition of an offense specifies the state of mind sufficient for the commission of that offense, without distinguishing among the elements thereof, the specified state of mind shall apply to all elements of the offense, unless a contrary purpose plainly appears.

*State v. Kong,* 77 Hawai'i 264, 266, 883 P.2d 686, 688 (1994) (citations omitted).

### 4.

 Astronomo questions the court's jury instruction that "the prosecution must prove beyond a reasonable doubt . . . [t]hat . . . ASTRONOMO was previously convicted of committing a felony . . . and . . . did so intentionally, knowingly or recklessly." Astronomo contends that "the circuit court erred in failing to instruct the jury that the mens rea element of the two crimes of which [Astronomo] was convicted applied to each and every actus reus element."

Astronomo argues that "one cannot 'do' an attendant circumstance such as the status of being a convicted felon, the mens rea element of the instructions told the jury that there was no mens rea element for the actus reus element of being a convicted felon." (Footnote omitted.) Astronomo explains that "[h]ad the circuit court used the verb 'to act,' as used in the definitions of the states of mind from HRS § 702–206 [5], instead of the verb 'to do,' the instructions on the applicable states of mind would have adequately covered this point." (Footnote added and omitted.) We conclude that Astronomo's argument lacks merit.

 According to HRS § 702–205 (1993) [6], each element of an offense is one of the following three possibilities:

> (1) "conduct"; (2) "attendant circumstances"; or (3) "results of conduct." We conclude that, in HRS § 134–7(b), the element "has been convicted . . . of having committed a felony" is an "attendant circumstance."

HRS § 702–206 (1993) states, in relevant part, as follows:

Definitions of states of mind.

(1) "Intentionally."

**6.** HRS § 702–205 (1993) states, in relevant part, as follows:

> Elements of an offense. The elements of an offense are such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as:
> (a) Are specified by the definition of the offense[.]

(a) A person acts intentionally with respect to his conduct when it is his conscious object to engage in such conduct.

(b) A person acts intentionally with respect to attendant circumstances when he is aware of the existence of such circumstances or believes or hopes that they exist.

. . . .

(2) "Knowingly."

(a) A person acts knowingly with respect to his conduct when he is aware that his conduct is of that nature.

(b) A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist.

. . . .

(3) "Recklessly."

(a) A person acts recklessly with respect to his conduct when he consciously disregards a substantial and unjustifiable risk that the person's conduct is of the specified nature.

(b) A person acts recklessly with respect to attendant circumstances when he consciously disregards a substantial and unjustifiable risk that such circumstances exist.

The jury was properly instructed regarding HRS § 702–206. We suggest that the jury instructions would be clearer if they also told the jury that pursuant to HRS § 702–205:(1) the element "has been convicted . . . of having committed a felony" is an "attendant circumstance"; [7] and (2) the element "[n]o person . . . shall own, possess, or control any firearm or ammunition therefor" is "conduct."

## CONCLUSION

Accordingly, we affirm the Second Circuit Court's January 27, 1999 Findings of Fact, Conclusions of Law; Order denying Astronomo's June 25, 1998 Motion to Suppress Evidence. We vacate the December 18, 1998

Judgment and remand for a new trial consistent with this opinion.

---

**7.** In this case, this particular instruction was unnecessary because Astronomo stipulated that he was a convicted felon when the offense in this case allegedly occurred.